for the continuance of any case wherein he is employed as leading counsel."

The Regular Session of the State Legislature of 1936 was convened on May 11, 1936, and adjourned on July 8, 1936.

Hence the trial judge could not do otherwise than grant the continuance applied for.

In view of the fact that the delay granted the respondent, Morrison, for answering has long since expired and that the adjournment of the Legislature occurred more than three months ago, we see no reason why the proceedings instituted by the relator against the respondent, Morrison, cannot be promptly heard and determined in the district court.

For the reasons assigned, the rule nisi herein issued is discharged and relator's application denied.

170 So. 785

SHELL PETROLEUM CORPORATION v. CALCASIEU REAL ESTATE & OIL CO. et al.

No. 33472.

April 27, 1936.

On Rehearing Nov. 4, 1936.

M. C. McGehee, Jr., and W. E. Dyche, Jr., both of Houston, Tex., and Pujo, Bell & Hardin, of Lake Charles, for appellant.

J. H. Heinen, of Jennings, and Cline, Thompson & Lawes, of Lake Charles, for appellees.

O'NIELL, Chief Justice.

This is an interpleader suit. The object is to determine who is entitled to the royalty of one-eighth of the oil produced by the Shell Petroleum Corporation as lessee of a tract of land, having an area of 81 acres, formerly belonging to the matrimonial community between G. W. Johnston and his wife, who were the lessors. The contest is between Mrs. Johnston, on the one side, and the holders of the title emanating from the matrimonial community, on the other side. Only half of the one-eighth royalty is in contest. Mrs. Johnston concedes that the other defendants, who are her opponents, and whose title emanates from the matrimonial community between her and her husband, own half of the one-eighth royalty. Mrs. Johnston's claim is founded not upon her half interest in the community estate, but upon the fact that the lease, from which the one-eighth royalty came, is a lease of two tracts of land, of equal area, one tract belonging to the community estate and the other to the separate estate of Mrs. Johnston. The 81 acres of land which belonged to the matrimonial community between Mr. and Mrs. Johnston is described as the W. ½ of S. W. ¼ of section 18, T. 9 S., R. 6 W. No drilling has been done on the remaining tract of 81 acres, which was included in the lease, and which belongs to Mrs. Johnston and is under her separate administration and control. Her tract of land is the W. ½ of S. W. ¼ of section 17, in the same township and range. She contends that the lease is not a severable lease, or two separate leases, but a joint lease, under which the value of the royalty of one-eighth of the oil produced from either tract of land should be paid to the lessors jointly—one-half for Mrs. Johnston and one-half for the parties holding title from the matrimonial community between her and her husband. The judge of the district court held that the lease was intended to be a joint lease, and in fact would be a joint lease but for the fact that the lessors were husband and wife; but the judge decided that the lease was not valid as a joint lease because the original lessors were husband and wife.

Mrs. Johnston has appealed from the decision.

None of the other defendants, among whom the fund deposited in court by the Shell Petroleum Corporation was ordered distributed, has either appealed or answered Mrs. Johnston's appeal. These defendants, who are the appellees, are the Calcasieu Real Estate & Oil Company, Inc., and the Reconstruction Finance Corporation, and the liquidating trustees of the Calcasieu National Bank, in Lake Charles. The rights of all of them are derived, through mesne conveyances, from a sheriff's sale, made in the foreclosure of a mortgage on the 81 acres of land which belonged to the matrimonial community between Mr. and Mrs. Johnston, and from which tract alone the oil was produced. The mortgage was on record at the time when the contract of lease was made; but the mortgagee signed and placed on record an instrument subordinating his mortgage to the lease, and agreeing that, in the event of a foreclosure of the mortgage, the 81 acres of land then affected by the mortgage would continue to be subject to the lease. The consideration paid to the mortgagee for subordinating the mortgage to the lease was $405, which was half of the cash bonus (at $5 per acre) paid by the lessee for the lease.

We agree with the judge of the district court that the lease in question was intended to be, and is in fact, a joint lease. The instrument does not in terms declare that it is a joint lease; but there are many expressions in it which, taken together, indicate that the intention of all of the parties was that the lessors were making a joint lease. The lessors are referred to in the singular number, or as one party to the contract, in every instance where they are referred to at all throughout the instrument. For example, in the first paragraph, it is declared: "That G. W. Johnston and Mrs. N. L. Johnston, * * * herein called Lessor (whether one or more), * * * does hereby grant, demise and lease unto Shell Petroleum Corporation," etc. The reason why the parenthetic phrase is there—"whether one or more"—is that the contract was made on a printed form. For that reason none of the printed words or phrases was chosen especially for this identical contract; but the words and phrases used in all of such printed forms of contracts, which are intended for general use, such as mining leases, insurance policies, etc., are worded with great care and by men of expert knowledge and experience in such matters, and with the idea of avoiding disputes, by providing for any and every condition that may prevail, or contingency that might arise. Hence it is quite likely that the printed phrase in this contract, "herein called Lessor (whether one or more)," was adopted not merely for the sake of brevity or for convenience, but for the purpose of dealing with the lessors, if there should be two or more, not severally, or with each lessor separately, but with both or all of them jointly and collectively, as a combination or group of individuals having a mutual interest in the transaction. That method of dealing with two or more lessors is advantageous to the lessee, in the fulfillment of his obligations, where

two or more separate tracts of land, owned separately by the lessors, are embraced in one lease.

Another fact which, to some extent at least, indicates that the lessors intended to make a joint lease is that the two tracts of land, which are situated three-quarters of a mile apart, and are owned separately, are included in one description, without any indication of separate ownership—thus:

"The West Half (W½) of the Southwest Quarter (SW¼) of Section Seventeen (17), and the West Half of the Southwest Quarter (SW¼) of Section Eighteen (18), all in Township Nine (9) South, Range Six (6) West, Louisiana Meridian, Jefferson Davis Parish, Louisiana."

Another significant declaration appears in the next paragraph, which follows immediately the description of the land, and which is all printed except the acreage, "One Hundred and Sixty-two (162)"—viz.:

"2. Subject to the provisions of paragraph '10' hereof, for the purpose of determining the amount of any money payment hereunder, said land shall be considered to comprise One Hundred and Sixty-two (162) acres, even though it actually comprise more or less; but it is Lessor's intention to lease hereby all of the land and interest in land owned by Lessor in said sections," etc.

The significant part of this paragraph, 2, is in the statement of only the total area of the land leased, instead of the area of each tract, and in the reference to the "Lessor's intention" and the "land owned by Lessor in said sections," thus dealing with the lessors collectively, or as one party, "for the purpose of determining the amount of any money payment hereunder." Although it does not appear in the record, and is not important, a computation, from the dimensions of each of the two sections, as they appear on the official photolithograph of the township, shows that the total area of the two tracts described in this lease is 162.16 acres, one tract having an area only .07 of an acre less than 81 acres, and the other having an area only .23 of an acre more than 81 acres. The statement in the contract of lease, that the land leased was "considered to comprise" 162 acres, indicates that each of the corresponding subdivisions, which ordinarily would contain 80 acres, was "considered to comprise" 81 acres, and hence that the lessors had equal interests in the lease as far as the acreage went.

Paragraph 5 contains the stipulation for the payment of the royalty, thus: "Lessee agrees as to royalties: First, to deliver to the credit of Lessor in the pipe line to which Lessee may connect Lessee's wells the equal one-eighth (1/8) part of all oil produced and saved by Lessee from the land hereby leased, or, from time to time, at the option of Lessee, to pay Lessor the posted market price of such one-eighth (1/8) part of such oil as of the day it is run to the pipe line or storage tanks," etc. Certainly, there is nothing here to indicate that Mr. Johnston, representing the matrimonial community, was to receive a

royalty from the community's 81 acres only, or that Mrs. Johnston was to receive a royalty from her 81 acres only. On the contrary, the wording of this paragraph indicates that the intention was that the lessors together should receive the royalty of one-eighth of the oil produced from either tract or both tracts of land. The effect was to give each lessor one-sixteenth royalty on 162 acres of land, instead of one-eighth royalty on 81 acres.

In paragraph 10 of the contract it is stipulated that, if "Lessor" owns a less interest in the land described than the entire, undivided and unqualified fee-simple estate therein, then all royalties or rental shall be payable to "Lessor" only in the proportion which "Lessor's" interest in the leased land bears to the entire, undivided and unqualified fee-simple estate therein. Then follows the stipulation that all royalty and rental due or payable to "Lessor" may be either paid to "Lessor" personally or deposited to the credit of "Lessor" in the First National Bank at Lake Charles, La., or in the First National Bank at Houston, Tex.—each bank being constituted "Lessor's" agent. The lessors having a common agent or depository to receive for their joint account any royalties that might become due to them, from oil or gas produced from the leased land, signifies that there was no intention on the part of the lessors to keep a separate account of the one-eighth royalty coming from one or the other of the two tracts of land.

In paragraph 11 of the contract it is stipulated that the rights of either party to the contract may be assigned, in whole or in part, but that no such change or division in the ownership of the land, or royalties or rental, or any part thereof, shall increase the obligations or diminish the rights of the lessee. Then comes this important stipulation: "That, regardless of any such change or division, said land shall be developed and operated, and all royalties accruing hereunder shall be treated, as an entirety; such royalties shall at all times be divided among and paid to the owners thereof in proportions according to the acreage and/or interest owned by each," etc. This stipulation for developing and operating the land as an entirety, and for treating the royalties as an entirety and apportioning them between or among the owners in proportion to their acreage, etc., had reference to a change or division of ownership of the leased land occurring subsequent to the making of the lease; but the purpose of the stipulation was to prevent converting the joint lease into a severable lease, or into two or more separate leases; all of which shows that the lease was considered originally to be a joint lease.

In paragraph 12, which is the last paragraph of the contract, it is declared: "Lessor warrants and agrees to defend the title to all of said land." If the lease had been a severable lease, instead of a joint lease, each lessor, very likely, would have warranted and agreed to defend his or her own title, but not the title of the other lessor.

■ After the mortgage which we have referred to was foreclosed, and the title of

the matrimonial community between the Johnstons in the 81 acres in section 18 became vested in the mortgagee, Southwest Louisiana Farm Mortgage Company, the company and Mrs. Johnston gave to the Shell Petroleum Corporation, as lessee, a "Rental Division Order," directing the lessee to pay $81 to Mrs. Johnston and $81 to the Southwest Louisiana Farm Mortgage Company. The rental stipulated in the lease, for delaying drilling operations, was $1 per acre per year. The depositary named in the rental division order, after Mrs. Johnston's name, and again after the name Southwest Louisiana Farm Mortgage Company, was First National Bank, Lake Charles, La. The description of the 81 acres owned by each party to the instrument was given after their names, respectively. But we do not attach any importance to this division order, because it was stated in the instrument: "The above division covers only the payment of delay rentals and does not purport to cover royalties." This division order, therefore, does not indicate, one way or the other, what the intention of the lessors was with regard to the division of the one-eighth royalty.

The analysis which we have made of the contract in question shows that it is a joint lease, in the sense that the obligations of the lessors are joint obligations, and that the obligations of the lessee are in favor of the lessors jointly. It was so held, with reference to a similar contract of lease, in the case of Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, L.R.A.1917D, 1115 —thus:

"A mining lease whereby several lessors or grantors dispose of the mineral rights on several tracts of land for a gross price, without stating the amount paid to each grantor and without stating or designating the area of land belonging to each grantor, creates a joint obligation on the part of the lessors or grantors, because it is impossible to affirm that the lessee would have paid a proportionate consideration for the lease or mineral rights on only a portion of the land. In such a contract, a stipulation that operations for the drilling of a well for oil or gas shall be commenced by the lessee within one year cannot be construed to mean that operations for the drilling of a well shall be commenced on each tract of land belonging to the different lessors or grantors."

In the Nabors Case the question which depended upon whether the lease was a joint lease on the part of the lessors was whether the obligation of the lessee to commence the drilling of a well within a year required commencing drilling within the year on each separate tract of land belonging to each lessor. The ruling was that the obligation of the lessee in that respect was in favor of the lessors jointly, and hence that the drilling of a well on one of the areas leased was a compliance with the obligation in favor of the lessors jointly. The corollary is that, in a joint lease, where there is no stipulation on the subject, the obligation to pay the stipulated royalty is an obligation in favor of the lessors jointly, requiring the royalty due from any part of the land to be apportioned between or among the lessors in proportion to the acreage owned by each

of them. It would seem very unfair to allow the lessee in such a case to discharge his obligation to all of the lessors jointly by drilling a well on the land of only one of them, and by paying all of the royalty to the one lessor. In the opinion rendered in the Nabors Case, referring to articles 2080 and 2081 of the Civil Code, defining joint obligations and severable obligations, it is said: "But the Code does not lay down a rule for determining what contracts are joint and what are severable, except that, when several persons join in the same contract to do the same thing it produces a joint obligation on their part, and that, when an obligation is incurred in favor of several persons for the performance of something for their common benefit, it creates a joint obligation in their favor. Whether a contract is severable or joint depends upon the intention of the contracting parties as revealed by the language of their contract and the subject-matter to which it refers."

▆▆ Inasmuch as the question, whether the rights and obligations of the parties to a contract in any given case are joint or severable, depends entirely upon what was the intention of the parties to the contract, and, inasmuch as the question, as to what was the intention of the parties in any given case, is only a question of fact, the decisions on the subject are of little or no value as precedents. The decision in each case turns not upon a presumption of law but upon the terms of the contract. The only rules that are applicable in such cases are the rules for the interpretation of contracts. For example, the appellees

in this case, claiming all of the one-eighth royalty, because the oil came from the W. ½ of S. W. ¼ of section 18, cite the Oklahoma case, Lusk v. Green, 114 Okl. 113, 245 P. 636, where it was held:

"Where a husband and wife, each owning a tract of land not contiguous but several miles apart, execute an oil and gas mining lease, and each tract is separately described in and covered by the same lease contract, it will not be presumed that either intended to convey to the other a royalty interest in his or her land, unless there is some affirmative evidence evincing such intention."

All that that decision may be considered authority for is that, under the conditions stated, particularly where the two tracts of land which are owned separately are several miles apart, and each tract is described separately in the contract of lease, "it will not be presumed that either [party] intended to convey to the other a royalty interest in his or her land, unless there is some affirmative evidence evincing such intention." What that means is that there is no general rule or presumption of law, one way or the other, as to how two or more lessors, entering into one contract of lease of several tracts of land belonging to them separately, intend to divide the royalty—the question being dependent, in each case, upon the wording or interpretation of the contract. As another example, in T. B. Harness and Wife v. Eastern Oil Co., 49 W.Va. 232, 38 S.E. 662, the contract by which Harness and his wife leased two contiguous tracts of land, one tract containing 152 acres and

belonging to Mr. Harness and the other tract containing 35½ acres and belonging to Mrs. Harness, was held to be in all respects a joint lease of the 187½ acres of land.

The appellees, in support of their claim to all of the royalty of one-eighth of the oil produced from the W. ½ of S. W. ¼ of section 18, rely mainly upon the case of United Gas Public Service Co. v. Eaton et al., 153 So. 702, decided by the Court of Appeal for the Second Circuit. The ruling in that case was, in effect, affirmed by this court, by a refusal to grant a writ of review, on the ground that the judgment was correct. The reason why the judgment, maintaining that the owners of the mineral rights on one tract of land were not entitled to share in the royalty from a gas well on another tract, covered by the same lease, was that the owners of the mineral rights on the nonproducing tract had construed their contractual rights so that they had no interest whatever in the mineral rights on the producing tract of land. The facts of the case were very simple. B. F. Young owned half of the mineral rights on 80 acres of land, being the S. ½ of the S. W. ¼ of a regular section. J. J. Emmons owned the 40 acres forming the western half of the tract, and being the S. W. ¼ of S. W. ¼ of the section; but Emmons owned only half of the mineral rights in his 40 acres—the other half of the mineral rights belonging to Young. J. D. Eaton owned the 40 acres forming the east half of the tract, and being the S. E. ¼ of S. W. ¼ of the section; but Eaton owned only half of the mineral rights in his 40 acres—the other half of the mineral rights belonging to Young. Under one contract, Emmons and Eaton and Young leased the 80 acres of land for the production of oil and gas; and, under the lease, a producing gas well was brought in on the east half of the 80 acres, that is, on the 40 acres described as the S. E. ¼ of S. W. ¼ of the section, and belonging to Eaton. It was not disputed that Young was entitled to half of the one-eighth royalty, because he owned half of the mineral rights in both of the 40-acre tracts. The question was whether Eaton (and his transferees) owned all of the other half of the one-eighth royalty, or owned that half of the one-eighth royalty jointly with Emmons and his transferees. Stated differently, the question was whether the one-eighth royalty belonged one-half to Young and one-fourth to Eaton (and his transferees) and one-fourth to Emmons (and his transferees), or belonged one-half to Young and one-half to Eaton and his transferees. The ruling was that Emmons and his transferees had no interest whatever in the royalty, or mineral rights on Eaton's 40 acres, because Emmons and his transferees had construed their contract to mean exactly that. Emmons and Eaton each sold off parts of their mineral rights, or interest in the royalty, after they and Young had entered into the lease; and, in each instance, Emmons sold the mineral rights, or interest in the royalty, only on his 40 acres; and in each instance where Eaton sold a part of his royalty or mineral rights he described only his 40 acres of land. The result was that, when

the suit was tried, Emmons owned only one-fourth of the mineral rights on his nonproducing 40 acres; another man owned an eighth of the mineral rights on Emmons' 40 acres; and two other men owned each a sixteenth of the mineral rights on Emmons' 40 acres. That accounted for half of the mineral rights on Emmons' 40 acres, and, as we have said, Young owned the other half of the mineral rights on Emmons' 40 acres, as well as on Eaton's 40 acres, on which the gas well was brought in. Certainly the transferees from Emmons, by buying a share in the mineral rights in his 40 acres only, did not acquire any mineral rights in Eaton's 40 acres. And, by the same token, Emmons, by claiming to reserve a fourth interest in the mineral rights on his own 40 acres only, virtually disclaimed any interest in the mineral rights in Eaton's 40 acres. One of the rules for the interpretation of contracts, prescribed in article 1956 of the Civil Code, is that, when the intent of the parties is doubtful, the construction put upon the contract by the way in which it has been executed or dealt with by the parties themselves or by one of them with the assent of the other, "furnishes a rule for its interpretation." The Court of Appeal applied that rule when the court said, on page 708 of 153 So. of the case:

"In the case at bar, had the lessors intended to pool their mineral interests by signing a joint lease to Perkins [from whom the United Gas Public Service Company acquired the lease]; it seems to us that Eaton and Emmons thereafter, when disposing of fractional portions of their

royalty rights, would not have confined their transfers to the respective 40 owned by them, but would have described the entire 80-acre tract. * * * And, certainly, when Eaton's transferees bought and paid for portions of his royalty rights they never dreamed that those interested in the other 40 had any semblance of right to participate with them in the benefits they hoped to enjoy from their investments."

· The Court of Appeal, in the Eaton Case, said that the lease was a joint lease with regard to the obligation of the lessor to commence drilling operations within 12 months, and hence that commencing drilling operations within the 12 months on one of the 40-acre tracts was a compliance with the obligation in favor of both of the landowners. The court expressed the opinion also that the joining of two or more landowners, owning separate or distinct tracts, in one lease for the production of oil or gas, does not · create a presumption that they thereby tacitly agree to pool their interests. The court said that the intention of the parties, in that respect, had to be determined by the terms of the contract, and the circumstances of each case. The ruling in that case, however, was founded upon the fact that, whenever either of the landowners, Emmons or Eaton, after making the lease, sold a fractional part of his royalty or mineral rights, he described only the 40-acre tract owned by him, and not the whole 80-acre tract that was leased. It was, legally, impossible for the transfers of portions of the royalty or mineral rights on only the 40-acre tract described in the deeds, respectively, to con-

vey an interest in the royalty or mineral rights on the adjoining 40-acre tract.

If Mr. and Mrs. Johnston had intended that the obligations of the lessee should be several and not joint obligations, it is likely that they would have made separate contracts, so that the lessee could not, by drilling a well on one of the two tracts within the time specified, hold the other tract under lease indefinitely, without development, or payment of any rental—without any obligation even to drill offset wells to protect the owner of that tract—and without any benefit whatever to him or her. The Civil Code, in article 2084, declares: "Several obligations [as distinguished from joint obligations], although created by one act, have no other effects than the same obligations would have had, if made by separate contracts; therefore they are governed by the rules which apply to all contracts in general." And article 2081 of the Code fits this case exactly. It declares that, when an obligation is entered into in favor of several persons for the doing of something for the common benefit of all of the obligees, "it creates an obligation which is joint in favor of the obligees." There is no reason whatever for believing that Mr. and Mrs. Johnston intended that the result of their contract with the Shell Petroleum Corporation should not necessarily be for their mutual advantage, but might eventually be for the advantage of only one of them, to the prejudice of the other.

Our conclusion being that, by this joint lease, Mr. and Mrs. Johnston pooled their interests, and agreed that each of them should receive half of the one-eighth royalty that might be due from either tract of land, the question is whether their agreement in that respect was null because of their being husband and wife.

The judge of the district court was of the opinion that the effect of Mr. and Mrs. Johnston's pooling their interests was that Mrs. Johnston thereby exchanged half of the one-eighth of any oil or gas that might be produced from her 81 acres of land for half of the one-eighth of any oil or gas that might be produced from the 81 acres belonging to the matrimonial community. That idea comes naturally from the false impression that the owner of the mineral rights in a tract of land is, by virtue of his owning the mineral rights, entitled to one-eighth of any oil or gas that may be produced from the land. And that impression comes from the general—and almost universal—custom, in the leasing of lands for the production of oil or gas, of allowing the lessor, as rent, one-eighth of the oil or gas that may be produced from his land. It is the contract, however, and not the custom, that controls the parties. A contract of lease for the production of oil or gas may be made as well for a cash consideration, or for any other consideration, as for the payment of a royalty. And, if the consideration is the payment of a royalty, the royalty is not necessarily one-eighth of the oil or gas that may be produced from the land, but is whatever portion the parties to the contract agree upon. Hence it cannot be said that Mrs. Johnston was entitled to a royalty of one-eighth of whatever oil or gas

might have been produced from her 81 acres of land, by virtue of her ownership of the land, or of the mineral rights in the land. She was entitled to only that portion of the oil or gas that a lessee would contract to allow her. In this instance, the lessee agreed to pay her, instead of one-eighth of the oil or gas that might be produced from her 81 acres of land, one-sixteenth of the oil or gas that might be produced from her 81 acres and from the 81 acres belonging to the matrimonial community. We must bear in mind that this one-sixteenth of the oil or gas that might have been produced from Mrs. Johnston's land would not have been her oil or gas, but would have belonged to the lessee, when brought to the surface and into the possession of the lessee. And so, the one-sixteenth that Mrs. Johnston was to receive, of the oil or gas produced from the 81 acres of land belonging to the matrimonial community, belonged not to the matrimonial community, but to the lessee, when the oil or gas was brought to the surface and into the possession of the lessee. It is the one-sixteenth of the lessee's oil or gas that Mrs. Johnston is entitled to—whether the oil or gas comes from her 81 acres or from the 81 acres belonging to the matrimonial community. It is well settled that the paying of a royalty, under a mineral lease, is the paying of rent. Spence v. Lucas, 138 La. 763, 70 So. 796; Logan v. State Gravel Co., 158 La. 105, 103 So. 526; Board of Commissioners of Caddo Levee District v. Pure Oil Co., 167 La. 801, 120 So. 373; Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264.

This pooling arrangement, which Mr. and Mrs. Johnston made under one contract with the lessee, might have been effected as well by the making of two contracts—one between Mr. Johnston and the lessee and the other between Mrs. Johnston and the same lessee—as by the making of one contract with the one lessee. It is true that it was necessary that the consent of both Mr. and Mrs. Johnston should have been given to the lessee, in order to effect this pooling arrangement by which each lessor should receive a royalty of one-sixteenth of the oil or gas produced from the other's land, in addition to the one-sixteenth of the oil or gas produced from his or her own land. In that sense, it may be said that the agreement between the husband and wife, on the one side, and the lessee, on the other side, was virtually an agreement between the husband and wife. Though it be so, it was such an agreement as the law permits the husband and wife to enter into, as an incident of a contract between them and a third person. It has been decided, at least three times, that a married woman may obligate herself and subject her separate property to liability for an obligation of her husband or of the community. Mathews Bros. v. Bernius, 169 La. 1069, 1075, 126 So. 556, 558; Howard v. Cardella, 171 La. 921, 132 So. 501; United Life & Accident Insurance Co. v. Haley and Wife, 178 La. 63, 150 So. 833, 834. These decisions were interpretations of Act No. 132 of 1926, which was one of the statutes enacted for the purpose of relieving married women of at least some of the re-

strictions upon their authority to enter into contracts. In the United Life & Accident Insurance Company's Case the ruling in the Mathews Brothers Case was construed as meaning "not that a married woman could not sign with her husband in a contract between him [meaning them] and a third party, but that she could not enter into a contract with her husband, she to be one of the contracting parties and he the other." The act of 1926 was superseded by Act No. 283 of 1928, which uses stronger and plainer language —and possibly goes further—in the emancipating of married women. We have some doubt as to whether the act of 1928 permits the husband and wife to transfer their property to one another, and to make all other such contracts between them, as they might make with strangers. The phraseology of the statute is very comprehensive; but it does not in terms provide that a married woman may enter into contracts directly with her husband. It is not necessary to decide in this case whether the Legislature intended to go that far in the act of 1928. It is sufficient, for deciding this case, that (in section 3) the statute declares:

"That married women shall have. capacity to bind themselves personally in any form, or to dispose of or hypothecate their property, by way of security or otherwise, for the benefit of their husbands or of the community between them and their husbands."

That is exactly what Mrs. Johnston did when she pooled her 81 acres of land with the 81 acres belonging to the matrimonial community, represented by her husband, in order to make a lease which would benefit both Mrs. Johnston and the matrimonial community. The only possible objection that the law might urge against this transaction, but for the act of 1928, would be that the disposition or hypothecation which the wife made of her property was for the benefit of her husband or of the matrimonial community. And that objection is removed by the act of 1928.

Our conclusion is that Mrs. Johnston is entitled to half of the royalty of one-eighth of the oil or gas produced or to be produced from either or both of the 81-acre tracts of land described in the lease to the Shell Petroleum Corporation as the W. ½ of S. W. ¼ of section 17 and the W. ½ of S. W. ¼ of section 18, in T. 9 S., R. 6 W.

It appears that one J. C. Means, Jr., who was cited to answer this proceeding, claimed an interest in the royalty in contest, by virtue of what purported to be a sale to him by Mr. and Mrs. Johnston of a half interest in the W. ½ of S. W. ¼ of section 18, in T. 9 S., R. 6 W., after the Johnstons were divested of their title to the land. The judge of the district court held that Means had no interest in the lease or the royalty in contest; and the attorneys for Means admit in their brief that the judgment in that respect is correct.

The judgment appealed from is amended thus: It is ordered, adjudged and decreed that Mrs. N. L. Johnston, wife of George W. Johnston, be, and she is hereby, recog-

nized as the owner of half of the royalty of one-eighth of the oil or gas, or of the oil and gas, produced or to be produced from the W. ½ of the S. W. ¼ of section 17 and the W. ½ of the S. W. ¼ of section 18, in T. 9 S., R. 6 W., or from either or both of these tracts of land, under the lease made by G. W. Johnston and his wife to the Shell Petroleum Corporation on the 18th day of June, 1929, and recorded in Conveyance Record No. 35, p. 587 et seq., in the office of the recorder for the parish of Jefferson Davis. It is therefore further ordered, adjudged and decreed that Mrs. Johnston shall be paid half of the remainder of the fund deposited in court, after the costs of court have been paid, and that only the remaining half of the fund shall be distributed and apportioned among the other defendants in this suit as directed in the judgment appealed from. In all other respects the judgment is affirmed.

### On Rehearing.

LAND, Justice.

The various issues involved in this litigation have been thoroughly discussed and correctly decided in our original opinion.

In addition to the reasons assigned in that opinion for our holding that the lease in this case is a joint lease, paragraph 11 of the lease expressly declares that such is the intention of the parties thereto.

The pertinent part of paragraph 11 of the lease reads as follows: "It is agreed that the estate of either party hereto may be assigned in whole or in part. All of the covenants, obligations and considerations of the within lease shall extend to and be binding upon the parties hereto, their heirs, executors, administrators, successors, assigns, and successive assigns. But it is expressly agreed, with reference to every change or division whatsoever, and howsoever arising or effected, in the ownership of said land, royalties or rental, or other moneys, or any part of the same, or any of the same, that no such change or division shall operate to increase the obligations or diminish the rights of Lessee hereunder; that regardless of any such change or division, said land shall be developed and operated, and all royalties accruing hereunder *shall be treated, as an entirety, such royalties shall at all times be divided among and paid to the owners thereof in proportions according to the acreage and/or interest owned by each,* and Lessee shall not be required to offset wells on separate tracts or portions of said land nor to furnish upon or as to any such tract or portion separate measuring or receiving tanks," etc. **Tr.** pp. 28 and 29. (Italics ours.)

It is therefore ordered that the rehearing granted herein be set aside, and that our original decree be reinstated and made the final judgment of the court.