SINCLAIR CRUDE OIL COMPANY, a corporation, Plaintiff in Error,

v.

The OKLAHOMA TAX COMMISSION et al., Defendants in Error.

No. 37676.

Supreme Court of Oklahoma.

April 29, 1958.

Rehearing Denied May 20, 1958.

Application for Leave to File Second Petition for Rehearing Denied July 2, 1958.

Angus A. Davidson, James H. McGowan, Tulsa, Geo. B. Schwabe, Jr., Regional Sol., Tulsa Region, Jesse L. Ballard, Asst. Regional Sol., James O. Worrell, Trial Atty., U. S. Dept. of the Interior, Tulsa, of counsel, for plaintiff in error.

R. F. Barry, Oklahoma City, for defendants in error.

CARLILE, Justice.

This is an appeal by Sinclair Crude Oil Company, a corporation, from an order of the Oklahoma Tax Commission assessing a gross production tax and a proration tax under the provision of Title 68 O.S.1951 § 833 and § 1220.1, against the company by reason of its having purchased the oil produced from land communitized and consolidated into two tracts or units, one tract being designated in the written communitization agreement as Delaware Extension Unit, or sometimes referred to as Central Consolidated Tract, covering 2,540 acres of land, and the other tract designated as Delaware District Unit, covering 2,490 acres. The communitization agreements are very similar in form and the general statements herein apply to each.

The agreements provide in their introductory portions that the lessee is the holder of subsisting oil and gas leases, or interests in leases, on the land comprising the unit and desires to operate the land as a single unit for the purpose of enabling it to more efficiently produce and operate the leases and to attempt to increase production and ultimate recovery by means of water flood methods, and further recites that the other parties designated as royalty owners are the owners in severalty of land or certain portions of the land or mineral interests, including oil and gas and all rights incident thereto, subject to the valid oil and gas leases of record, in the land within the boundaries of the unit; that all the described lands insofar as the oil, gas and other mineral rights in said unit be communitized and consolidated into one tract and united for the purpose of the payment of royalties on the oil or gas produced and saved therefrom in order that the properties may be more efficiently developed, produced and operated; to obtain the greatest recovery of oil and gas; to promote maximum conservation, and to assure to each of the parties to the agreement his or its fair and equitable share of the products recovered, and for such purpose and to that extent amend and modify the oil and gas leases.

The record shows that Rachel Collins and Emma Rogers, parties to separate communitization agreements, were enrolled as members of the Cherokee Tribe of Indians, and as such were awarded homestead allotments of land, which allotments were by treaty with the United States Government exempt from taxation while owned by the allottees. Each of said allottees, with the approval of the Secretary of the Interior, executed an oil and gas lease on her respective homestead. On June 1, 1954, while the homestead lands were productive of oil, each of the allottees, with the approval of the Secretary of the Interior, voluntarily executed the communitization agreements in which the homestead allotments were situated. The State Tax Commission assessed a gross production tax and proration tax on the royalty oil which the Cherokee allottees were entitled to receive, and the purchaser of the oil, Sinclair Crude Oil Company, withheld the amount of the taxes assessed and filed a written protest against the assessment on the ground that the allottees' lands, including the minerals therein, were exempt from taxation. At a hearing on the protest there was filed by the respective parties a written stipulation of fact, one paragraph of which is as follows:

"It is stipulated that Emma Rogers' royalty interest in the oil and gas underlying her homestead was found and determined to give her the right to take .0031121% of the oil and gas produced from the Central Consolidated Tract, and Rachel Collins' royalty interest in the oil and gas underlying the homestead was found and determined to give her the right to take .0010358% of the oil and gas produced from the Delaware District Unit."

At the conclusion of the hearing on the tax protest the Tax Commission made findings of fact, Findings 5, 6 and 7 are as follow:

"5. Rachel Collins and Emma Rogers voluntarily exchanged the major portion of their ⅛th royalty interest in the productive minerals underlying their respective homesteads for the following stated undivided fractional interest in the productive minerals underlying the communitized area which embraced their homesteads:

"Emma Rogers

.0031121% (or .0248968% of the ⅛th royalty interest).
"Rachel Collins
.0010358% (or .0082864% of the ⅛th royalty interest).

"6. The interest that Rachel Collins and Emma Rogers acquired in the productive minerals underlying the communitized area was a new and distinct interest from their interest in the

productive minerals underlying their homesteads, which is evidenced by the fact that Emma Rogers has a vested interest in .0031121% of said oil and gas produced from the communitized area and Rachel Collins has a vested interest in .0010358% of said oil and gas irrespective of whether oil or gas was produced from their homesteads.

"7. In view of the fact that the provisions of the Indian Allotment Acts are liberally construed in favor of Indians, and in view of the fact that it has not been shown that no oil was produced from either of the homesteads in controversy, the Commission finds that Emma Rogers and Rachel Collins should be held to have received and retained .0248968% and .0082864% respectively, of ⅛th of the royalty oil produced from their homesteads and said interest in the productive minerals underlying their homesteads should therefore be held exempt from gross production tax."

The Tax Commission concluded, as a matter of law, that each of the allottees alienated the royalty interest so exchanged as fully and to the same extent as if they had sold and conveyed said exchanged interest outright, and upon so alienating said interest they each lost any exemption from the taxes in controversy that they might otherwise have had under the provisions of the Cherokee Allotment Act, 32 Stat. 716, and denied the tax protest except to the extent as stated in paragraph 7 of the Commission's finding of fact, as quoted herein, and assessed a gross production tax and a proration tax in the total sum of $475.79.

The plaintiff in error, protestant, asserts, and the Tax Commission apparently agrees, that the separate tracts of land allotted as homesteads to Rachel Collins and Emma Rogers are non-taxable so long as they are held and owned by the allottees. Such tax exemption is sustained by the following authorities: Choate v. Trapp, 224 U.S. 665, 32 S.Ct 565, 56 L.Ed. 941; Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478; Weilep v. Audrain, 36 Okl. 288, 128 P. 254. 68 O.S.1951 § 15.2, provides:

"The following property shall be exempt from taxation:

"All property of the United States, and such property as may be exempt by reason of treaty stipulations existing at statehood between the Indians and the United States Government, * * *."

The plaintiff in error, Sinclair Crude Oil Company, in its petition in error, assigns as error the several findings of fact and conclusions of law embodied in the order of the Tax Commission, and presents its position on appeal as follows:

"Each Allottee involved in this appeal now owns the entire royalty interest in all minerals underlying her allotted homestead lands, but does not own any royalty interest in minerals underlying other tracts within the respective communitized areas."

And further asserts:

"The Commission's order is based on the fundamental assumption that the execution of the communitization agreements effected a cross-conveyance of the mineral interests of the royalty owners involved. This appeal seeks to establish the invalidity of that assumption."

The position of the Tax Commission is shown by its order assessing the tax. The holding of the Tax Commission is based on the assumption that the communitization agreements constituted an exchange and transfer between the several royalty owners whereby each acquired title to an undivided interest and share in the oil underlying and produced from each of the several tracts of land comprising the unit. The Commission does not state or point out in its brief the nature or character of the ownership or title by or under which the allottees and each of the other royalty owners acquired or hold a share or interest in the royalty of each of the several tracts of land com-

prising the communitized area, but asserts that the provisions of the Gross Production Tax Law, Title 68 O.S.1951 § 821, covers any property rights attached to or inherent in the right to the oil, and is broad enough in its language to subject the allottees' royalty interest to the tax, irrespective of the precise character of their title thereto, and that the precise nature of the taxable interest is without gross production significance, and the the cases cited by the oil company on the proposition of whether the unitized agreement effected a transfer of royalties are not in point. Such statement in the brief appears to be in conflict with and a departure from the Commission's holding that the Cherokee Allottees alienated the interest so exchanged as fully and to the same extent as if they had sold and conveyed said exchanged interest outright.

We here refer to certain provisions of the communitized agreements which we think pertinent to the issue involved.

Paragraph 1 of the Delaware District Unit Agreement provides, in substance, that the oil and gas and the several interests of royalty owners in and to the oil in and under the described land are consolidated and communitized into one tract or unit, and may be developed or operated as one tract as fully as if it had been originally covered by one oil and gas lease, and in lieu of all royalties in said leases provided for on oil produced and saved from the individual tracts, the owners or parties entitled thereto shall receive royalties from the consolidated tract in the manner, on the basis, and in the amount in the leases provided for, but only to the extent and in the proportion as set out in exhibit "B". The exhibit contains a description of the several tracts of land comprising the unit, with the names of the owners and the percentage allocation of ⅛th royalty to each lease.

Paragraph 4 provides that any well or wells heretofore or hereafter drilled on any portion of the communitized area, wherever located, shall be deemed to have been drilled under the terms of and located on land covered by each of the oil and gas leases covering any portion of the communitized area, and further provides that the lessee shall not be required to furnish separate measuring tanks or receiving tanks, or other measuring device by reason of the diverse ownership of the oil.

Paragraph 5 provides that except as therein expressly modified, amended and changed, the terms and provisions of the several oil and gas leases covering the tracts within the communitized area with respect to the lessor's royalty ownership and otherwise shall be and remain unaltered and in full force and effect.

Paragraph 6 provides that the royalty owners, to the extent of their surface rights and interests, give and grant to the lessee an easement or right of way on, over and across the lands, with the right of ingress and egress, for the purpose of constructing plants necessary to carry on secondary operations, and other enumerated rights incident to the purposes of the contract.

Paragraph 7 provides that the agreement shall be a covenant running with the lands embraced within the communitized area.

Paragraph 12 provides that the agreement shall terminate upon the cessation of all production from the communitized area, and upon final termination the rights of the respective royalty owners in respect to the oil and gas shall revert to the tract or tracts of land owned by them in severalty in said area.

The communitization agreements here in question constitute a valid form of private contract and the intention of the parties thereto is to be given effect as expressed therein, and in accordance with the established principles of law. From a consideration of the agreements as a whole we fail to agree with the findings and holdings of The Tax Commission wherein it holds that the agreements constitute and effect an exchange of title to the minerals or royalty interests underlying the several tracts of land among the several royalty owners, parties to the agreements. If

there was an exchange of ownership in and to the oil as between the several parties to the agreements the exchange became effective from and after the oil was produced and did not result from any change in the title and ownership of the oil and minerals in place and underlying the soil. Unless the Cherokee allottees conveyed their title and ownership in the oil while it was part of the land then their royalty share of the oil was exempt from taxes at the time it was produced and severed from the soil.

The Tax Commission states in its brief that the royalty owners construed the agreements as granting to each royalty owner an undivided interest in the minerals of the others by reason of the provision in the agreements that upon termination thereof the minerals shall revert to the tract or tracts of land owned by the royalty owners. The force and merit of the statement is limited because the agreements do not provide that the "minerals" shall revert, but instead provide that the "rights" of the respective royalty owners in the oil, gas and other mineral interests shall revert to the tract or tracts of land owned by them in severalty.

■ Oil and gas unsevered from the soil is part of the realty, and in order for the communitization agreements to constitute and effect an exchange, conveyance or cross transfer between the royalty owners of title and ownership to an undivided fractional share and interest in the oil underlying or which may be produced from the several tracts of land, as found by the Tax Commission, it was and is essential that the agreements contain adequate operative words such as grant, bargain, convey, or others of like import, sufficient to effect a conveyance of title to the minerals underlying the land. Higgins v. Oklahoma City, 191 Okl. 16, 127 P.2d 845, 16 Am.Jur. 469, Sec. 49. The only place in the agreements where any operative word is found is in the paragraph which grants to the lessee a surface easement or right of way over and across the lands, and the right of ingress or egress for the purpose of constructing plants, laying pipelines, and for other purposes necessary for operations under the contract. The granting of the easement does not affect the title to the minerals. The communitization agreements were evidently drafted or reviewed by a party possessing sufficient legal training and skill to employ the terms ordinarily used to convey or grant mineral interests, and the omission of such terms indicate an intention to avoid any cross conveyances of such interests.

The U. S. 10th Circuit Court of Appeals in the case of Phillips Petroleum Company v. Peterson, 218 F.2d 926, holds that a unitization provision in oil and gas leases permitting unit operation did not result in cross transfer of royalty interests. The unitization agreement in that case specifically stated that it should not be construed to transfer title to any land or to any lease, and the court pointed out that such construction might arise from other provisions therein. The court there recognized a conflict of authority on the effect of the pooling agreement with respect to whether a cross transfer of royalty interests results, and stated that the conclusion reached in that case was supported by well reasoned and more persuasive authority. Authorities supporting the views expressed in that case included Kenoyer v. Magnolia Petroleum Co., 173 Kan. 183, 245 P.2d 176; Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., 218 Pa. 320, 67 A. 615; Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785; Lynch v. Davis, 79 W.Va. 437, 92 S.E. 427, L.R.A. 1917F, 566; Arkansas Louisiana Gas Co. v. Southwest Natural Production Co., 221 La. 608, 60 So.2d 9. Some decisions which have followed a contrary or cross conveyance theory in the circumstances there involved are Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Belt v. Texas Co., Tex. Civ.App., 175 S.W.2d 622, and Tanner v. Title Insurance & Trust Co., 20 Cal.2d 814, 129 P.2d 383. The text or work, Hoffman, Voluntary Pooling and Unitization, Oil and Gas, at page 159 refers to the

next two above Texas decisions and observes that it was probably unnecessary to a proper disposal of the cases to hold that the unitization agreements conveyed interests in the real property among the respective land owners. And at page 160 expresses our views on the question as follows:

"In the ordinary pooling or unitization agreement, even in the absence of express provisions on the subject, the parties do not actually intend to convey their real property interests to each other but intend only to share the results of the pooled or unitized operation, an end which is much less drastic than the cross-conveyance. The royalty owners in particular will ordinarily expect their act of pooling or unitization to effect a sharing of the production after it is obtained but not to effect cross-conveyances of the oil or gas in place and of the real property interests themselves. Variations in the pooling or unitization arrangements would, of course, have substantial effect upon such analysis of the true intention of the parties. * * *".

From a consideration of the record in the present proceeding we conclude and hold, as a matter of law, that the lands comprising the homestead allotments of Rachel Collins and Emma Rogers were exempt from taxes, and that the communitization agreements to which the said allottees were parties did not constitute or effect a conveyance or exchange of any title to the oil and other minerals while underlying the several tracts of land comprising the communitized units as between the several royalty owners thereof, and the execution of the agreements by the said Cherokee allottees did not terminate the tax exemption status of the homesteads of said allottees, and the oil underlying or which may be produced from the same, and The Tax Commission erred in holding that the major portion of the royalty oil owned by the Cherokee allottees was subject to a gross production and proration tax.

The order of The Tax Commission is vacated, and this proceeding is remanded to the Oklahoma Tax Commission with directions to sustain the protest to the assessment of the taxes involved.