Earl V. **WHITWELL** and Cecil Whitwell, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 17084.

United States Court of Appeals Fifth Circuit.

June 30, 1958.

Tuttle, Circuit Judge, dissented.

Thomas A. Harrell, Shreveport, La., for petitioners.

Marvin W. Weinstein, Melva M. Graney, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Arch M. Cantrall, Chief Counsel, Claude R. Marshall, Atty., I.R.S., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

In this case petitioners seek a review of a decision of the Tax Court of the United States, 28 T.C. 372, affirming a deficiency assessment against them for income taxes for the year 1950.

As material, the case here presented for decision is thus correctly stated by petitioners:

"Petitioners, residents of Caddo Parish, Louisiana, are husband and wife, and in 1950 were the owners of undivided interests in oil and gas leases (called, for convenience, the Logan and Hodges Leases) covering properties in Webster Parish, Louisiana, upon which they had drilled, in conjunction with other owners of the leases, three gas wells. The leases in question lay a short distance outside of the limits of the Cotton Valley Gas Field which had previously been unitized by the Louisiana Commissioner of Conservation for the reinjection and re-cycling of gas and the production of liquid hydrocarbons. During the early part of 1950, the Louisiana Commissioner held a hearing and issued Orders enlarging the Cotton Valley Gas Field Unit so as to include the property owned by petitioners unitizing petitioners' interests with the interests of other owners in the field. In addition to allocating ownership of the minerals in the unit, the Commissioner ordered the costs of development and of the facilities and equipment on the enlarged unit apportioned among the owners of the unit to the extent that they participated in the unit. The Cotton Valley Operators' Committee was designated the operator of the unit. Petitioners' share of the costs of development and facilities in the enlarged unit was $14,358.21 less than the amount which they had contributed to such facilities and costs by virtue of their ownership of the Logan and Hodges Leases, and they were entitled to reimbursement of this amount from the other owners of the unit.

"Four months after the unitization had been effected, the Operators' Committee met to determine the procedure to be followed in making the adjustment for the costs as ordered by the Louisiana Commissioner and decided to make such adjustment in two steps. The first provided that the purchasers of the production from the enlarged unit be notified

to withhold from the proceeds of seven-eighths (⅞ths) of eighty per cent (80%) of the production from the unit, a sufficient amount to compensate petitioners and others whose leases had been brought within the enlarged unit for the cost of the wells and facilities upon such leases. At the same time, they made a cash assessment against petitioners and the others whose wells had been included within the unit for an amount equal to their investment in the facilities and equipment in the unit after it was enlarged. Under this arrangement, the purchasers of the production, upon instructions of the Cotton Valley Operators' Committee, paid petitioners some $36,000 which amount had been withheld from the proceeds of the sale of two months' production from the unit and, at the same time, petitioners were assessed approximately $22,000 which they thereafter paid in cash to the Operators' Committee for the account of the owners of the unit.

"Upon examination of petitioners' 1950 Income Tax Return, Respondent determined that the unitization of petitioners with the Cotton Valley Unit constituted an exchange of like kinds of property by which petitioners had exchanged their interests in the Hodges and Logan leases and equipment thereon for a smaller interest in the enlarged Cotton Valley Unit; that such exchange was non-taxable under provisions of Section 112(b) (1) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 112(b) (1)]; that petitioners had retained payments out of production as reimbursement for the costs of the facilities on the Logan and Hodges leases; that these oil payments entitled petitioners to future payments of a stated sum to be made solely out of a specified fraction of oil or gas to be produced from the operation of income producing property and, thus were depletable income.

"Petitioners appealed the assessment to the Tax Court where they did not question (and, in fact, agreed with) the determination of the Respondent that the Order of the Louisiana Commissioner had effected a tax free exchange, but did contend the amount they had received as a result of the apportionment of the costs of development did not constitute income from an economic interest in oil and gas in place but was 'other property' (being, in effect, cash payments) received in an exchange which should have been taxed under the capital gains provision of Section 112(b) (1) I.R.C. (1939)."

All the facts were stipulated, and the submission to the Tax Court was, and here is, on this stipulation.

In the pleadings and briefs, the sole issue presented to the Tax Court was whether sums received by petitioners as a result of the adjustment of well costs and facilities in connection with the unitization order of the Louisiana Commissioner of Conservation constituted depletable income or whether they were to be considered as received in discharge of an obligation created in effecting the unitization; and, if so, the extent, if any, to which such payments were taxable as gain.

No issue as to whether an exchange had taken place was raised, both parties admitting that such was the case.

The Tax Court, in its opinion held: that the order of the Commissioner unitizing the properties did not result in an exchange; and that, because the equalization payment to petitioners was made not by a check from the debtors, as had been the case in respect of the debt due by petitioners, but by an arrangement to have the purchasers of the production withhold out of payments due petitioners' debtors sums sufficient to discharge their debt to petitioners, the amounts thus received by the petitioners, though in fact merely payments in discharge of an obligation arising out of the equalization, in some way not made clear became in

law ordinary income subject to depletion.

As petitioners see the case, three questions are presented to this court:

(1) Whether or not the exchange issue was before the Tax Court, and, if so, whether the decision was correct;

(2) Whether, as the Tax Court held, petitioners received or retained in connection with the sums paid petitioners in equalization an economic interest in oil and gas in place, or whether, as they contend, they simply received, from the owners of the other interests in the unit, sums in payment for the facilities and for equipment which they had surrendered; and

(3) Whether, if the Tax Court was correct in holding there was no exchange, it erred in failing to hold that the amount received by petitioners in equalization constituted a return of capital and was therefore not taxable.

The respondent, seeing only one question presented, thus states it:

"The taxpayers, originally the owners of undivided oil and gas leasehold interests, owned interests in three separate unitized production units which were incorporated into a larger unitized production unit on April 15, 1950, by order of the Louisiana Commissioner of Conservation. The taxpayers were given a participating share in the larger unit, and in order to equalize costs of development, also received the right to net oil payments in a stated amount.

"The question is whether the Tax Court erred in holding that the oil payments received during the taxable year are taxable as ordinary income subject to depletion."

While on its face and at first blush the issue presented seems to raise many questions of difficult interpretation, varying from state to state, as to the effect, property-wise and tax-wise of unitizations, voluntary and compulsory, we believe that those questions are not important enough here to deserve more than passing mention and brief discussion since the determination of the issue here turns not upon unitization and its legal effects but upon the narrow question of what petitioners were to, and did, receive in the equalization adjustment.

Upon the effect of the tax aspects of unitization, it is sufficient to set out below excerpts from Chapter 25 of Miller's "Oil & Gas Federal Income Taxation", 3rd Ed., 1957.[1]

Of the legal aspects of unitization, property-wise, the nature of the unitized title, it will, we think, be sufficient to

---

1. In the author's note at page 316, it is said:

"There is a lack of published rulings in decided cases, with respect to the formation and readjustment of interests of unitizations. Apparently with respect to the formation and operation of unitized properties, the rules have been accepted by the Revenue Service and taxpayers alike. In turn this involves an acceptance of the fact that the general rules of taxation are applicable, there being a lack of characteristics requiring exceptional treatment."

Of some interest, in view of the contentions made, is the author's note at page 317, as to "Gain or Loss upon Formation":

"*The Revenue Service has accepted the principle that the formation of a unit constitutes, in the first instance, a taxfree exchange of realty. In the event there is a cash adjustment, the transaction is viewed as a taxfree exchange with boot involved. Accordingly, the creditors above described would be entitled to treat the cash adjustment as subject to the capital gain provisions of the Code.*

"*Where the equalization is accomplished by a 'production payment',* [and this is the situation in this case], *the Revenue Service does not accept the theory that a separate property has been created. They view the 'production payment' as a temporary enlargement of the participation, i.e., working interest share.*"

To this is added the warning in another note:

"*One of the dangers associated with the formation of unitizations is the possibility of conversion of basis in depreciable assets to that of depletable assets. A fear of this danger is well founded.*" (All emphasis supplied.)

refer to two excellent works, Myers, "The Law of Pooling and Unitization, Voluntary and Compulsory," Banks & Co., particularly Chapt. XII, "The Nature of the Unitized Title", and Hoffman, "Voluntary Pooling and Unitization", Matthew Bender & Co. In Chapt. IV, discussing the various forms of unitization, voluntary and compulsory, the author, at page 144, Sec. 2 begins a discussion of the legal effect of pooling or unitization by pointing out that in Texas,[2] the courts authoritatively recognize that an exchange or cross-conveyance of properties has occurred. Discussing the opposition to and the difficulties arising out of that view, he indicates that in the opinion of many, it would be better if it were not so held. Stating that only Texas and California, and the Court of Appeals for the Fifth Circuit in Texas cases, cited in note 2, supra, have most definitely stated and imposed the theory of cross-conveyance when this was actually in issue, and that Oklahoma and the Louisiana Supreme Court[3] by dictum have failed to recognize that pooling will effect a cross-conveyance of royalty interests, he aligns the Louisiana Supreme Court definitely with the opposite view in Shell Petroleum Co. v. Calcasieu, 185 La. 751, 170 So. 785 and in Arkansas-Louisiana Gas Co. v. S. W. Nat. Prod. Co., 221 La. 608, 60 So.2d 9, the latter construing the effect on the mineral ownership of compulsory unitization or pooling.

■ From this brief preliminary view, it at once appears that, while the Tax Court in this case does not cite Louisiana decisions in favor of its view that no cross-conveyance occurred, but does cite a decision of its own, Belridge Oil Co. v. Comm., 27 T.C. 1044, a case of voluntary pooling in California, in which state, as we have seen, the Supreme Court of California has taken the contrary view, it appears to have reached the right conclusion in this case, that no cross-conveyance occurred, not for the reason or upon the authority that it gave in its decision but because of the holding of the Supreme Court of Louisiana.

■ As has been said above, however, we regard as without importance in the decision of this case whether cross-conveyancing did or did not occur here. What is important here is that the Tax Court has found, without any basis in fact or in law to support the finding, that in accepting the arrangement that the equalization payment would be made to them by the purchaser of the production as agent for the debtors, taxpayers did not merely receive payment of their debt but acquired an economic interest to the extent of these oil payments in the minerals in place, and must, therefore, treat the payment to them of the sums it was agreed were due them as a debt, not as a return of their capital but as ordinary income subject to depletion.

This ruling denies not only the substance but the truth and right of the matter, and, if allowed to stand, will pervert and defeat the intention of the parties, inflicting a wholly unjust loss on petitioners and unjustly enriching the United States. As the taxpayers properly insist, the payment to petitioners of the equalization money by the purchaser of the oil and gas, as agent and paymaster for the owners, petitioners' debtors, was merely a convenient arrangement to all concerned for the payment to them of their debt and the return to them of their capital investment. It was not different from but precisely what occurred when, in equalization of the same unitization, the debtors, this time the petitioners, paid a similar amount in cash.

2. Veal v. Thomason, 138 Tex. 341, 159 S. W.2d 472; Belt v. Texas Co., 175 S.W.2d 622; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43. Cf. Whelan v. Placid Oil Co., 5 Cir., 198 F.2d 39; Campbell v. Fields, 5 Cir., 229 F.2d 197; and Phillips Petroleum Co. v. Ham, 5 Cir., 228 F.2d 217, 221.

3. Martel v. A. Veeder, Inc., 199 La. 423, 6 So.2d 335.

The concession by the Tax Court that if they had received this amount in cash from their debtors, the situation would have been different, at once fully demonstrates the fallacy of, and completely demolishes, its holding. As a result, the petitioners, instead of receiving a return of their capital to equalize their agreed investment in the venture, are visited with the loss of part of it by being compelled to pay income tax on it when in fact it is not income but merely a return of capital.

The judgment was wrong. It is reversed and the cause is remanded with directions to disallow the deficiency.

TUTTLE, Circuit Judge, dissents.