168 So. 313

SUPERIOR OIL PRODUCING CO. et al. v.
FORRESTIER et al.

No. 33821.

April 27, 1936.

Mouton & Davidson, Ed. Meaux, and Dan DeBaillon, all of Lafayette, for appellants Donlon et al.

Liskow & Lewis, of Lake Charles, for Superior Oil Co.

Voorhies & Labbe, F. Xavier Mouton, Waldo H. Dugas, and Bailey & Mouton, all of Lafayette, for appellees.

LAND, Justice.

This is a concursus proceeding brought by the Superior Oil Producing Company and the Pure Oil Company, under the provisions of Act No. 123 of the Legislature of the year 1922.

The companies, operating under a mineral lease, had completed, at the time of the filing of this suit, one producing well on lot 4 of the lease, and, prior to trial, had completed a second well on lot 2 of the lease, also producing oil in paying quantities.

The funds received from the sale of the one-eighth royalty were deposited in the registry of the court, and all those claiming an interest in the funds were cited to appear, and did appear, to prosecute their claims.

All of the defendants, except Mike Donlon, Edgar Mouton, Edward Meaux, J. J. Davidson, Jr., Daniel DeBaillion, and Alcidus Begnaud, agreed to the distribution of royalties as proposed by plaintiff companies. Donlon et al., however, refused to accept the distribution, after claiming a greater interest in the funds deposited than the companies thought they were entitled to.

The judgment of the lower court upheld the contentions of the companies and the other defendants against Donlon et al., and these defendants have appealed.

(1) The facts of the case are as follows:

The lease under which plaintiff companies operate was granted December 16, 1929, by Coralie Domingue, widow of Firmin Forrestier et al., to L. H. Murray, but at the time of the trial the title to the lease had vested in plaintiff companies.

The lease described 52 acres of land in Acadia parish, owned in indivision by Coralie Domingue et al., all of whom executed the lease as joint lessors.

On August 6, 1932, the owners of the land, Isidore Prejean, and Leonce, Raymond, Antoine, Philibert, Manuel, and Eugenie Forrestier, made an amicable partition of same by dividing the property into 8 lots, and allotting to each of the owners the following lots: Lot 1, 4.57 arpents, Antoine Forrestier; lot 2, 4.57 arpents, Eugenie Forrestier; lot 3, 4.57 arpents, Manuel Forrestier; lot 4, 4.57 arpents, Manuel Forrestier; lot 5, 4.57 arpents, Raymond Forrestier; lot 6, 4.57 arpents, Leonce Forrestier; lot 7, 4.57 arpents, Philibert Forrestier; lot 8, 30 arpents, Isidore Prejean.

After the partition was made, various owners sold their lots, or mineral interests in the lots, so that at the time of the trial the defendants either owned the land, or rights in the land, in divided portions.

The primary term of the lease, during which it could be kept in force and effective without operations on the land, expired on December 16, 1934, but prior thereto the owners of all the land and mineral rights executed extension agreements, substantially in the same form, except Mike Donlon, Edgar Mouton, Edward Meaux, J. J. Davidson, Jr., and Daniel DeBaillion, who, with Aleidus Begnaud, are appellants, and acquired mineral rights in lot 4, from and through Alcidus Begnaud, who acquired this lot from Manuel Forrestier April 3, 1934.

Manuel Forrestier became the owner of lot 4 by the partition entered into by the original owners of the 52 acres, after they had granted the lease to L. H. Murray. On March 28, 1934, he, with the owners of other lots, executed an extension agreement. The filing of his extension agreement was delayed until April 5, 1934. On April 3, 1934, after the execution of this extension agreement, but prior to its recordation, the deed was signed by Manuel Forrestier conveying lot 4 to Alcidus Begnaud, and the deed was recorded on the day of its execution, and, therefore, prior to the time that the extension agreement was filed.

Because of this legal situation, plaintiff companies, after the end of the primary term of the lease, entered into extension contracts with Donlon et al., all of which are substantially in the same form, and one of which is here copied in full:

"An agreement entered into by and between Mike Donlon and Edgar Mouton, herein referred to as Lessors, and Superior Oil Producing Company and The Pure Oil Company, herein referred to as Lessees.

"Witnesseth: That,

"1. On December 16, 1929, by instrument recorded in Book F-4, page 336, of the

records of Acadia Parish, Louisiana, Coralie Domingue and others granted an oil, gas and mineral lease to L. H. Murray relating to and affecting Sixty arpents of land, more or less, in Section Thirty-four (34), Township Eight (8) South, Range Three (3) East, Acadia Parish, Louisiana, bounded on the north by Lovinski Richard, south by Despanie and Maurice Benoit, east by Parish line and west by Voorhies Prejean and Lester Johnston, being all the land of the then lessors in said section, the said lease being now held and owned by the Lessees herein.

"2. After the granting of said lease the said land was partitioned by the owners thereof and divided into eight (8) lots, as shown by instrument recorded August 6, 1932, in book U-4, page 323, of the conveyance records of Acadia Parish, Louisiana.

"3. The primary term of said lease contract, during which it could be kept in force and effect without operations on the land and as originally provided for, expired on December 16, 1934, but prior to said date the owners of all of said lands and rights therein, except the lessors herein and except other owners of interests in lot four (4) of the partition referred to, extended the term of said lease so that, as to all of said owners, it is now in full force and effect.

"4. Lessors, desiring that said lease be also continued in force and effect insofar as it applies to their interests in said lot four of the partition referred to, and for the consideration hereinafter recited, by this instrument revive and reinstate said lease contract so that it will be and remain effective and apply to their rights and interest in said lot four according to all the original terms and conditions thereof but subject to the agreements herein contained; the said lease to be considered effective to the same extent as if the lessors herein had extended the primary terms of the lease contract prior to December 16, 1934, for a period expiring one year from and after the date hereof.

"5. In consideration of the agreement of the lessors hereinabove contained and of the reinstatement of said lease contract insofar as it affects lessors rights in and to lot four of the partition referred to, the lessees herein bind and obligate themselves to drill a well on some portion of the lands described in the lease referred to, in search of oil, gas or other minerals, operations for the drilling of said well to be commenced within forty five days from the date hereof; the said operations and the drilling of said well to be hereafter continued with reasonable diligence in a faithful effort to discover and produce oil, gas or some other mineral in paying quantities.

"6. As a further consideration for the agreement of the lessors herein contained, the lessees have paid to them the sum of ten and no/100 ($10.00) Dollars, the receipt of which is hereby acknowledged."

Paragraph 7 of the original lease reads as follows: "It is further agreed that all the conditions and terms herein shall extend to the heirs, executors, legal representatives, successors in interest and assigns, of the parties hereto; but no change in the ownership of the land, or any part thereof, or sale of mineral rights or royal-

ties, shall impose any additional obligations or burden on the Lessee, and to that end it is agreed that in case of any change of ownership of any part of said land or of any mineral rights or royalties therein, whether by conveyance, inheritance, partition or otherwise, the rentals and royalties accruing hereunder shall be paid to the new owner or owners, if entitled thereto under any such purchase, in proportion to their ownership of the whole of the land, mineral rights or royalties, so that no owner of a segregated part of said land or of mineral rights or royalties under such segregated part shall be entitled to the whole royalty accruing from development on said segregated tract, but only to such part of such royalty as the acreage in such segregated tract is to the whole acreage embraced in this lease; this covenant shall be taken and construed as a covenant running with the land and binding on all successors in interest to Lessors herein. The Lessee shall not be held responsible for the payment of such rental or royalties to such new owners unless and until the Lessee shall be furnished with the instrument of transfer, or a duly certified copy thereof, and in case of no transfer in writing then with legally sufficient evidence thereof, such evidence of transfer to be furnished at least thirty (30) days before such rentals or royalties are paid. If, by change of ownership, more than ten separate parties become entitled to royalty, Lessee may require, before paying royalty, that such parties so entitled designate, in a writing furnished to the Lessee, one of their number, or a trustee, to receive the payment of the royalty for all of them."

The companies and all defendants, except Donlon et al., insist that the contracts entered into by the companies with Donlon et al. reinstate the original lease, as to lot 4, "according to all the original terms and conditions thereof," and contend, therefore, that the royalties accruing out of production from any part of the 52 acres described in the original lease should be paid to the various owners in the ratios that their ownerships bear to the whole, as provided by the express terms of paragraph 7 of that lease.

Donlon et al., on the other hand, contend that because their extensions were granted after the five-year term, they are not bound by paragraph 7 of the lease as to lot 4, and that they should receive ½ of the total royalty from the well on that lot, as they are the owners of ½ of the mineral rights in and to lot 4.

We feel, however, that even after the partition, and after the original lease had expired as to lot 4, Donlon et al., as owners of ½ of the mineral rights certainly could execute an agreement whereby and wherein they would adopt, and make as their own contract, the original lease with all of its terms and stipulations, and, since they have clearly evidenced by such an instrument their intentions to adopt the original lease, and did actually adopt same, they are held bound by its terms and conditions.

It must be borne in mind that plaintiff companies did not, by any means, obligate themselves to drill a well on *this particular lot 4;* on the contrary, they obligated themselves, specifically, "to drill a well *on*

*some portion of the lands* described in the lease referred to," and this obligation was the main consideration for the extensions of the lease, since the only further consideration stated therein is the sum of $10 cash in hand paid. (Italics ours.)

If Donlon et al., under such a contract, can claim the whole royalty from the well on lot 4, then why cannot all the lessors under the contracts of extension signed by them, before the expiration of the original lease, make the same claim?

To place such a construction upon these extensions would nullify absolutely the provisions contained in paragraph 7 of the original lease, both as to contracts made *before and after* the expiration of the primary term of the original lease.

It will be noted that the contracts of Donlon et al. extending the lease refer to the lease, and describe the entire 52 acres, or 60 arpents, of land.

These agreements then stated that all of the other owners had granted extensions of the primary term of the lease, and then, in paragraph 4, continued to state that the "lessors" (Donlon et al.) desired that "said lease be also continued in force and effect," and that, for the consideration recited, they *revived and reinstated* "said lease contract," so that it would be effective and apply to their rights in lot 4 "according to all the original terms and conditions thereof." The same paragraph continued to say that the *said lease,* as to Donlon et al., *should be considered effective to the same extent as if the lessors had extended the primary term prior to the expiration date thereof.*

Donlon et al. were willing for plaintiff companies to drill at any place on the 52 acres because they knew, or must have known, that by reason of paragraph 7 of the lease, which they had reinstated and revived, they would receive their proportionate share of the royalties, regardless of the location of the well.

Besides, as Donlon et al. had only an interest in minerals in lot 4, containing 4.57 arpents, their chances for receiving royalties from any well drilled on any part of the 60-arpent tract would be much greater, by pooling their interests, than if a well was drilled on lot 4, a tract of only 4.57 arpents. It is inconceivable that any one owning a particular lot in an area covered by a joint lease should continue that lease as to his property, after its expiration, merely for the consideration of drilling a well, not on his property, but on property in which he had no interest, and from which he could derive no benefit.

In our opinion, the trial judge properly rendered judgment decreeing paragraph 7 of the lease to be now operative, and effective and binding on all defendants, according to their respective interests.

The judgment accordingly prorates the royalties deposited in the registry of the court, and fixes the percentage due to each of defendants, and decrees that such percentage or pro rata of all royalties hereafter accruing out of production of oil from the lands leased shall remain as fixed in the judgment, so long as the lease contract and amendments thereof remain in force and effect.

The judgment releases plaintiff companies from all liability to defendants as to deposits made in the registry of the court, and also, in the event of suspensive appeal, as to deposits made until final judgment.

The judgment also fixes the fees of the curators ad hoc representing absent defendants at $20 each, to be taxed as costs and paid out of the respective shares coming to the absentees represented by them.

We find no error in the judgment appealed from.

Judgment affirmed.

O'NIELL, C. J., absent.