In the Matter of the Estate of DAVID R. PAYNE, Deceased.

Surrogate's Court, Monroe County, July 20, 1936.

*R. H. Arnot*, executor in person, petitioner.

*Ira H. Morris*, for the respondent.

FEELY, S.   Testator, a childless widower, by his last will, composed by himself and executed in his late seventies, about three years before his death, directed his executor to expend the entire estate, both real and personal, to defray the expenses of publishing, without copyright, a manuscript the testator declares in the will he would leave, entitled " The Elijah Message," which he desired his executor to place in public libraries.   He also conferred on the executor a power of sale " for the proper settlement of my estate."

His estate comprises about $3,000 in realty and a like amount in personalty.   The net estate, $3,275, is sufficient to carry out the projected publication, to a considerable extent.   The manuscript consists of 4,400 lines, on eight-inch by eleven-inch sheets, all typed by the testator himself.

As the persons whom testator meant to be benefited by this publication are indefinite, as is also, to some extent, the purpose he had in view; and as the executor, in order to carry out the will, must exercise the power of sale and apply the proceeds, his fiduciary status in the premises is practically that of a trustee by implication. He now petitions to have the will construed in its legal effects for the reason that he alleges he is " unable to proceed with the settlement of said estate, because your petitioner is in doubt whether said will is enforcible or not; and there may be a failure of a legacy or devise therein."

On behalf of a brother and others who would take this estate if the testator's plan cannot be legally executed, it is urged that it is not known what, if anything, the book will accomplish; that portions of it may be considered libelous; and that public libraries are not likely to accept it; and that a greater good will be accomplished by giving the estate to the needy relatives.

The executor's difficulty arises out of the peculiar nature of this manuscript.   Its scope is described by the author himself in these words:

" Though I born in Oneida County, N. Y., in a family of verry moderate and was not given any educational advantages beyond a common school I came to Rochester resolved to do what I could to improve myself.

" I realize I have not gone verry far but I have read many books and heard many lectures never failing to go to hear good speekers when I could, but during my life in Rochester I have attended many churches and sectuary societies. I have studied all the churches and beliefs of the standard or orthodox religions and I have gone out from them to study other religious ideas such as theosophy, spiritualism and pantheism. We have all these people in Rochester, in fact I never knew of a place where there are so many religions. You know that spiritualism was born not far from Rochester. It seems singular that western New York should have pruced two religions, Mormonism and Spiritualism. But such is the fact. I have had a lot to do with some theosophists in Rochester * * * (MS. p. 63.)

" I am writing a book that I want published to be called the Elijah Message. The book is found in these pages that I spent years of study to develop. I have studied religion and religions for many years. i Have accumulated a little property which I have the right to do with as I please. Nobody has ever helped me to get together the little property I will leave. I have a lot of relations scattered all over the United States. They never paid me any attention even to the extent of sending me a card at Christmas. Some people have called me a religious fanatic. I am nothing of the kind. I seek to promote a purer religion than is now found in our churches. That religion is based upon the life of Elijah who set an example to the whole world of a correct and Upright life and devotion to God Almighty. Elijah was the forerunner of Jesus the Christ. Jesus Christ, I believe, based his teachings largely upon the work and service to men of the Prophet Elijah.

" To show the readers of the book which I expect to be published from this manuscript which I shall leave with my executor to publish that I have thoroughly studied religion and the various religious sects and that I have gone deeply into the history and teachings of all the faiths I want to lay down here some of the facts which I have gleaned over a long life of study and toil. I ask no odds of anybody. It is my money and nobody else's which will publish my views. I admit that I am not an educated man and maybe some of what I have here written may have to be changed by my executor who is well qualified to make all necessary changes. If I am not an educated man in the college sense I have made up in part of a college education by long study, in libraries and from good

books. I have also heard the best preachers and writers in Rochester and other places. I have heard such men as Phillip Brooks, Henry Ward Beecher, E. J. Chapin and my beloved friend, Dr. Crapsey * * * I have attended meetings of the Saxe Class for many years at the First Universalist Church under the leadership of Raymond H. Arnot, a profound scholar and thinker and one of the best informed men I ever knew. From all these sources I have absorbed abundant information of the better type. I believe with Benjamin Franklin that the real education a man receives is what he gives himself by study, reflection and observation. I am not egotistic enough to believe that anybody would read this book as a biography of my poor unworthy self, but as a summary and fairly accurate account of religions and churches. I stand for a simplified religion and it is because I think I am showing in this book what a simplified religion is that I want my views published and distributed to public libraries without cost to anybody except to my estate which is not large. Where I have discussed great characters in the Christian Church I do not mean to exclude from salvation or from eulogy men of other religious or lack of religious beliefs. I have read much of Confucius * * *. (MS. pp. 11 and 12.)

At the end of the book the author sums up thus: " In this book I have contributed my humble might to show how grand the church is; what a history it has had; the mightiest and best men of the world have been believers. The world today without the Church would be as a ship without a rudder. I hope what I have written here will show the world that the Church is absolutely necessary in the world to keep men's minds on the true, the noble, the beautiful, the just, the pure, the Holy. Amen."

This manuscript has been read throughout by the writer of this decision. In the book testator describes the history of most of the well-known religions, old and new, and makes reasonable comments on them from his own viewpoint of a " purer, simpler faith." He also discusses at length the attitude of the youth of our day toward religion. The foregoing quotations manifest the ability and style of the testator as an author.

As a rule, the courts do not try to further even a religious purpose that is indefinite and impracticable, especially if it is to be accomplished through the medium of a trust. It is hard to draw the line where indefiniteness begins to be fatal. About twenty-five years ago a Surrogate's Court held to be void for indefiniteness, notwithstanding the Tilden Act, bequests to an unincorporated association to be used " in the Lord's work." (*Matter of Compton*, 72 Misc. 289.) Enforcement might lead to contradictory purposes and results. " The bounty of a testator of uncompromising religious

views (might be) distributed among institutions managed by those having entirely different and antagonistic views." (*Matter of Shattuck*, 193 N. Y. 446.) A similar ruling was made on a bequest to an individual to be used " as he may desire in the Master's work." (*Matter of Seymour*, 67 Misc. 347.) About nine years ago the Court of Appeals found a bequest to be sufficiently definite to be enforcible which set up an implied trust of money to be applied where " it will be most effective in the advancement of Christ's Kingdom on earth." (*Matter of Durbrow*, 245 N. Y. 469.)' This particular provision was there interpreted to mean the advancement of the Christian religion, in the most general sense. While this decision emphasizes the duty of a court to give effect to such a legacy " by the application of the most liberal rules of construction that the law will permit " (Id.), it does not seem to overrule the two cases above cited, at least, not to wipe out altogether the defect of indefiniteness, with the incidental likelihood of such bequests falling into something private and selfish in kind.

Having this general rule of law in mind, it seems clear in the case at bar that there is nothing indefinite or impracticable about the ways and means that testator had in mind, no matter how general and indefinite may be his ultimate object of bringing about a purer and simpler faith. He is so definite about the book which is to be published and bestowed, at his expense, that we need not be concerned about its ultimate success, or its failure to effect any good. This is certain also, that the book, for all its lack of polish, still has a definite scientific value as the naïve, sincere, spontaneous record of the reactions to religion and churches of a thoughtful, self-educated man, who had no more than a common schooling and the betterment he acquired by the contacts described in the quotation set out above. The genesis of this book resembles that of another self-educated, thoughtful carpenter, the one who wrote " Progress and Poverty;" but Mr. Payne's book will never come any where near the eminence of Henry George's masterpiece. This testator, speaking of George Fox, remarks: " Isn't it a queer thing that the founders of all the religious faiths that I am acquainted with were lowly people of no particular education? The high brows never founded a religion " (p. 61). Mr. Payne had an uncommon store of mother wit; some of his observations are keen; and he is not without support when he laments the large numbers of " morons," and of thoughtless indifferent people there are to be found in the world. When one considers the vast sums, and the great efforts, that are being spent on religion, it must be of value to those in charge to see exactly how their work is affecting the mind of a man like this testator, and how he saw the work registering in the minds of less thoughtful persons about him, in various churches.

These considerations, however, are not decisive. The testator has specified a thing to be done that is practicable and, in his opinion, beneficent. On its face it may be productive of good. In those circumstances, the court cannot substitute its judgment for that of the testator. The latter is on good legal ground when he boldly asserts: " I have accumulated a little property which I have the right to do with as I please. * * * I ask no odds of anybody. It is my money and nobody else's which will publish my views."

Passing now from considering legally whether his work will do any good, the next inquiry is whether parts of it may do any harm, in the legal sense. In so far as the projected publication may be defamatory, neither the executor, nor the court, is obliged to incur the liability of publishing libelous matter, by helping the dead to defame both the living and the dead also. No New York case in point has been found; but two other States have considered the liability of an executor for publishing a will containing libelous matter. In *Citizens and Southern Nat. Bank* v. *Hendricks* (176 Ga. 692; 87 A. L. R. 230; 168 So. 313) the court recognized as applicable the maxim " *actio personalis moritur cum persona;* " and ruled that " If a paper executed as a will expresses libelous matter, and the act of the executor in propounding the will is relied on to complete the offense and afford ground for recovery against the estate, such reliance must fail, because the testator has died.

" If it be said that the act of the executor in propounding the will could be taken into account, the reply is that the executor was a creature or agency of the law to administer the estate, and was not the testator's representative in the continuation or consummation of the testator's wrong."

In *Harris* v. *Nashville Trust Co.* (128 Tenn. 573; 49 L. R. A. [N. S.] 897; 162 S. W. 584) the court held that, leaving the maxim out of consideration, a reputation had been very effectively damaged by publishing a will imputing illegitimacy to a legatee; but that as the executor was only an agent of the testator, in duty bound to probate the will, and punishable if he suppressed it, the case was not one in which the executor should be held to any liability; but if liability exists, the principal should be responsible. The maxim was there held inapplicable because it assumes a tort had been committed in the lifetime of testator; whereas in this case the right of action was held to have come into existence only upon the publication of the will after testator had died. Accordingly, it was held that an action for libel would lie against the executor as such, that is, against the estate.

Recently in New York a reversal of the maxim above quoted was effected by statute.* From the viewpoint of the pre-existing law

---

* Dec. Est. Law, § 118, added by Laws of 1935, chap. 795.

some general observations seem still pertinent. There is no obligation on a nominated executor, or on any other representative of an estate, to accept the office as such, if it is to be incumbered with a personal liability to an action for libel appearing on the face of the will; but it would seem to be for the public good that the property of any decedent should be disposed of, at his death, in an orderly and lawful manner, despite his abusiveness; and that when a nominated executor in a libelous last will does accept office and publishes the will to the extent of presenting it for probate to a competent court for the sole purpose of having it executed after the court has eliminated those portions of it that are non-dispositive and defamatory, the petitioning executor should be, as a matter of public policy, absolutely privileged and protected from personal liability for filing the petition (See *Lesser* v. *International Trust Co.*, 175 App. Div. 12, and *People ex rel. Bensky* v. *Warden of the City Prison*, 258 N. Y. 55), especially where he acted in good faith and without malice, because it is necessary for the court to consider the libelous portions of the will in order to eliminate them, at least to the extent of clearing the way for recording and effectuating any unobjectionable provisions remaining.

" Only by the exercise of such power may the publication of a post-mortem libel or the recording of indecent or offensive language written by a testator or by the draftsman of a will be denied judicial recognition." (*Matter of Speiden*, 128 Misc. 899.)

In several cases it appears that all parties were unanimous as to the propriety of such suppression. (*Matter of Bomar*, 18 N. Y. Supp. 214.) In *Matter of Meyer* (72 Misc. 566) Surrogate FOWLER held the offensive matter was not grave enough to be harmful; and declared he preferred not to exercise the power invoked to expunge it, even if he possessed it — which he doubted.

As to the liability of the testator, or of his estate, our courts have not yet made any ruling. It is clear, however, that one who requests another to publish defamatory matter, which he supplies, and which is published by the one to whom it is communicated, is liable as well as is the latter (*Roberts* v. *Breckon*, 31 App. Div. 431); and even a printer becomes liable by delivering copies to the author himself (*Youmans* v. *Smith*, 153 N. Y. 24), and so is a person who furnishes a newspaper reporter with defamatory information (*Thomas* v. *Smith*, 75 Hun, 573; *Valentine* v. *Gonzalez*, 190 App. Div. 490).

It is also the rule that " One who composes a libel does not thereby commit any actionable wrong. It is only when his act causes its publication that he commits an actionable wrong and becomes responsible for its consequences.

" It need not, however, be shown by direct evidence that the author of a libel procured its publication, if it appears that he did that from which his desire for, or his assent to the publication may be presumed." (17 R. C. L. 386.)

However, whether this testator became liable by harboring a supposedly defamatory testamentary plan until his death, and by then leaving it in train (See *Schaller* v. *Miller*, 173 App. Div. 998), and beyond his power to recall thereafter, when it would necessarily fall into the hands of others seeking to liquidate his estate; and whether he thereby bequeathed a liability to his estate, are questions that may be said to be academic in this case. His estate would not be liable in so far as any liability might depend on the recent amendment of the Decedent Estate Law (§ 118), which reversed, without any exception, the old maxim " *actio personalis moritur cum persona*," for that new section, effective September 1, 1935, was not retrospective; and this testator died, leaving this will and manuscript, on December 29, 1933. It suffices now that this testamentary plan, although not libelous on the face of the will, cannot be carried out, as it was written, without entailing a possible personal liability on the part of whomsoever participates in the execution of the plan it set up.

However, the extent to which expressions in the manuscript might be said to be defamatory is, at most, less than forty-five lines in the whole forty-four hundred. This small portion is widely scattered and is not all malicious. Most of it is such characterization as is, at times, found in the writings of some religionists, for still, in the mind of some, " Religion is polemic " (*Matter of Shattuck, supra*). For example, the author says that the living opponents of one who recently died here were " persecutors;" that the named originators, who recently died, of a certain sect were " insane;" that some of the practices of a local group were " hypocritical " or " pharasaical;" that the named leader of a definitely localized sect was a " fakir " and a " fraud;" that another small group thrived on the " humbug and deception," of which Barnum spoke; and that another small group were " devils incarnate;" all doing the work of the devil, etc. As a rule, however, the author is careful in his utterances; and sometimes corrects his characterizations; and evidently limits his strictures to some members only, not all of the group; and when he speaks of the very large groups, he clearly has in mind to attack their doctrine rather than their personnel, or any considerable number of identifiable individuals in that group, as for instance, in reference to the views held in the sixteenth century on predestination, his reaction is that today " no one outside a mad house would entertain such notions." Such generalities are not

actionable even though coupled with the name of one of the larger religious denominations.

Whatever is offensive, therefore, in this projected book is a comparatively small, incidental part of it that can readily be obliterated without impairing the substance of the author's message as he contemplated it. He himself said (*supra*), "maybe some of what I have here written may have to be changed by my executor who is well qualified to make all necessary changes." The executor, therefore, by assuming his office as such has taken upon himself the duty of obliterating the passages that may be offensive; and of publishing the rest of the book just as the author left it, for any merely literary editing of it would spoil the artless "human" flavor of it. In reading the manuscript, the writer of this decision has blue-penciled, for the editor's assistance, some of the expressions that should be deleted. The executor will have to be responsible for the complete discharge of this editorial duty.

My conclusion is that if this be done, the will can be thus effectuated; and that then the entire estate must be devoted to the purpose of publication and distribution; and that none of the estate can fall by law to the heirs of the testator.

Submit, on notice to counsel, the form of decree to be entered, with provision for insertion of allowances to be then made to counsel.