MARVIN, Judge.
This concursus was instituted to resolve a contest over production royalty accruing under an oil and gas lease on 235 acres that was executed by a predecessor in title common to the defendants-contestants, Wilburn and Rogers. Wilburn appeals a judgment decreeing that the royalty should be paid 155/235ths to Rogers and 80/235ths to Wilburn.
Wilburn contends that he should receive the entire royalty because the producing well is located on the 80 acre tract he acquired from the common predecessor in title and not on the 155 acre tract that was acquired by Rogers. The record does not reveal that a drilling and production unit was established for the producing well. See LRS 30:9. The issues concern the effect and applicability of what is called the “entirety clause” of the lease.[1] We affirm the judgment.
*589 FACTS
On September 5, 1972, Buckley, the common predecessor in title, executed the lease which was later assigned to plaintiff, Sun Exploration. The 235 acres were contiguous but were acquired by Buckley in different tracts at different times. The Buckleys were Mississippi residents. The northernmost 90 acres was community property while the remaining 145 acres was Buckley’s separate property which he had inherited. The lease, for a five year term, was a Bath’s Form Louisiana Spec. 14-BR1-2A-PX 10-65 Oil, Gas and Mineral Lease which covered the 235 acres. Production was obtained in 1977 from the Paluxy sand at a depth of about 2980 feet.
Buckley’s wife died in 1978 before royalty payments began. Buckley’s son, Tyrie Buckley, was recognized in a judgment of possession in his mother’s succession as the owner of an undivided ⅛ interest in the northernmost 90 acres. Sun Exploration began paying royalty ⅝ to Buckley and ¾⅛ to his son, Tyrie.
Buckley died testate in 1980. His will directed that the southernmost 145 acre tract be sold to Rogers and that the proceeds be placed in trust for Buckley’s grandchildren. Buckley’s will also bequeathed his ⅝ undivided interest in the northernmost 90 acres to his son, Tyrie. The succession representative consummated the sale of the 145 acres to Rogers on September 18, 1981, as the will directed. Tyrie Buckley was placed in possession of the 90 acres on October 15, 1981. On October 19, 1981, Tyrie Buckley sold the northernmost 80 acres to Wilburn, and on the next day, he sold the remaining or southernmost 10 acres to Rogers. There was no mention or reservation of minerals, royalty or other such rights in any of these transactions which occurred after the lease was executed in 1972. The producing well is in the northwesternmost five acres of the 80 acres acquired by Wilburn.
Wilburn contends that the trial court erred because Buckley “intended” that Tyr-ie Buckley receive the entire royalty from the well. The deposition of Tyrie Buckley and his father’s will are in evidence. The pertinent portion of the will says:
“To my legally adopted foster son, Tyrie Latimer Buckley, I bequeath my portion of the ninety acre tract of land I bought from the heirs of Tom Mustin in the year 1949, my portion being five-sixths of the total ninety acres according to the inheritance laws of the State of Louisiana, where this land is located in the southern portion of DeSoto Parish. This bequest I consider to amount in value to more than a third of all my Louisiana property, first because of the fertility of the land, next because there is at this time a producing oil well on it, but more important because there is a stand of Oak timber on it worth at least $15,000 on the present market.”
Tyrie Buckley testified that his father discussed his intentions with him a few months before his father died. He said that his father explained to him why he wanted the 145 acres sold to Rogers, that his father compared for him the “value” of the 145 acres and the 90 acres and explained that the timber on the 145 acres had been cut and that the 90 acres contained more valuable timber, which had not been cut, and the oil well. The remainder of the evidence was stipulated and consisted of the pleadings and other documentary evidence relating to title and to payment of royalty.
Royalty was paid ⅝ to Buckley and Ve to his son before Buckley’s death. After Buckley’s death, Tyrie Buckley was paid the full royalty, according to Tyrie Buckley’s deposition. For the period between October 22, 1981, and August 11, 1982, the *590 royalty was paid to Wilburn. After August 11, 1982, and before the concursus was instituted on December 8, 1982, and retroactively to October 1, 1981, royalty was paid 155/⅛ to Rogers and 8%35 to Wilburn. Sun received a certified copy of Wilburn’s deed to the 80 acres on October 22, 1981. Rogers notified Sun of his acquisition of the 155 acres and of his demands about August 11, 1982.
THE ENTIRETY PROVISION
“[Entirety] clauses are inserted in leases primarily for the benefit of the lessee to make it clear to lessors or subsequent transferees of the lessor or lessors that inside property lines created by later divisions of the fee ownership or by royalty conveyances shall not affect the lessee’s duties of development and operation. (It is clear, however, that even absent such clause, the duties of the lessee may not be increased by virtue of subsequent transfers by the lessor or lessors.) By virtue of an entirety clause in the lease, royalties from production under the lease are usually apportioned among mineral and royalty owners in accordance with their interest, wherever the well or wells may be located on the leased premises. Apparently the fact that a lease covers non-contiguous tracts is of no significance in determining the effect of an entirety clause upon the apportionment of royalties among the owners of mineral interests.” Williams & Meyers, Oil and Gas Law, § 521.3.
Wilburn agrees that the entirety clause in a lease, in the absence of a contrary provision in a conveyance by the lessor dividing the leased premises, requires that royalties be apportioned as the clause directs. Wilburn contends that the provision should not prohibit the lessor, however, from carrying out his intention to divide the leased premises and to apportion the royalty due him as he sees fit to selective transferees. Shell Petroleum Corporation v. Carter, 187 La. 382, 175 So. 1 (1937), lends some support to Wilburn’s argument, but there the lessor expressly conveyed to each of several vendees a specific royalty interest in a separate part of the leased property. The royalty was not apportioned between the several vendees and each vendee of the lessor was limited to the specific royalty under the specific tract which had been conveyed to him. The court concluded that the lessors in Carter “were at liberty to divide the royalties in [that] manner ...” 175 So. at p. 4. See comment at 12 Tulane L.R. 313 (1938).
Wilburn’s argument is succinctly expressed (and answered, in our opinion,) in a quotation he supplies from § 521.3 of Williams and Meyers, Oil and Gas Law, which we reproduce and emphasize in part:
“(1) An appropriate entirety clause in a lease will cause royalties to be apportioned despite subsequent subdivisions of the leased premises in the absence of contrary provision in a conveyance subdividing the leased premises.
“(2) The presence of such an entirety clause in the lease should not be viewed as inhibiting the lessor from conveying a portion of the leased premises with an express provision for non-apportionment of royalties.
“(3) However as far as the lessee is concerned, his duties may not be increased by such express provision for non-apportionment made in such subsequent conveyance by the lessor.
“(4) And such express provision in such subsequent conveyance does not affect the right of the owner of an interest in another portion of the leased premises to continue to claim the benefit of the entirety clause in the lease so as to be entitled to an apportioned share of the royalty from production anywhere on the leased premises.”
Supporting the above-quoted conclusions in Williams & Meyers is Shell Petroleum Corp. v. Calcasieu Real Estate & O. Co., 185 La. 751, 170 So. 785 (1936). There Mr. and Mrs. Johnston, as lessors, leased two 81 acre noncontiguous tracts in one lease. One tract was community property and the other was separate property of Mrs. Johnston. Production was obtained on the com *591 munity 81 acres. She contended she should be entitled to 81/i62 of the royalty because of the entirety clause of the lease on the 162 acres over the claim by her husband’s transferees of the 81 acres which before belonged to the community, that they were entitled to all of the royalty. The court agreed with Mrs. Johnston, reasoning that Mr. and Mrs. Johnston effectively “pooled” the two tracts in the lease to provide that royalty would be paid on the basis of 162 acres and apportioned to the owners of that acreage whether that royalty derived from production on one 81 acre tract or the other. See 170 So. at p. 791. See also Superior Oil Producing Co. v. Forrestier, 185 La. 11, 168 So. 313 (1936), pronouncing the same result where leased property had been partitioned into many tracts.
This result illustrates and supports the conclusion of the Williams and Meyers treatise that unless there is an express provision to the contrary in a conveyance by the lessor of a part of the leased property, the entirety clause requires apportionment of the royalty among each owner who acquires a part of the leased property. Robinson v. Horton, 197 La. 919, 2 So.2d 647 (1941), after Carter, approved the result and principle of Calcasieu Real Estate, supra.
The result is more readily comprehended when the lease is analogized to the modern production unit which may be compelled by order of the commissioner or established by conventional agreement. Each of the several owners of mineral rights within the unit is entitled to his respective share of the royalty or production from the unit. This is “pooling,” so to speak, which is mentioned in Calcasieu Real Estate and also in the more recent printed forms of oil and gas leases. See ¶¶ 6 and 7 of the 14-BR1-2A-PX form.
In the absence of forced or voluntary pooling or unitization, the leased property is considered as the producing unit. In the absence of an express provision to the contrary in transfers by the lessor of a part of the leased property, all transferees of the lessor proportionately share the royalty accruing under the lease in accord with their respective acreage in the leased property.
The critical question here presented is not the applicability or the effect of the entirety provision of the lease, but whether the will of George Buckley is an “express provision’’ contrary to the entirety provision. We conclude it is not.
Buckley’s will, dated November 21, 1979, made a specific bequest (quoted above) to his son of Buckley’s ⅝ “interest” in the 90 acres and directed that the 145 acres be sold to Rogers with the proceeds to be placed in trust for the benefit of his son’s two children. The will also included specific bequests to a library, a church, two cemeteries, his daughter-in-law, a cousin, and four collateral in-law relatives. The residuary estate was left to his son. Nothing in the will makes reference to royalty or to income from oil and gas production. Even should we assume Buckley’s intention arguendo, Buckley simply did not expressly “deal” with or direct a division of his royalty accruing under the 235 acre lease between Rogers and Tyrie Buckley. The only mention in the will of the “producing oil well” is that it is on the 90 acres that Buckley bought from Mustin in 1949 and that mention, in our opinion, relates solely to Buckley’s efforts to satisfy the forced heirship laws of Louisiana. Only Tyrie Buckley, the forced heir, can complain that his Louisiana legitime is infringed. His vendee, Wilburn, has no such standing. Rogers, incidentally, is also a vendee of Tyrie Buckley insofar as his deed to the 10 acres is concerned.
Similarly, Buckley’s executor, in the conveyance to Rogers, and Tyrie Buckley, in the conveyance to Rogers and in the conveyance to Wilburn, simply did not mention, deal with, or expressly limit or divide the minerals underlying the land conveyed or the royalty accruing to those minerals.
Rogers acquired 145 acres from Buckley’s executor and 10 acres from Tyrie Buckley which was burdened with the *592 Buckley lease. Wilburn acquired 80 acres from Tyrie Buckley burdened with the same lease. The minerals and accruing royalty were not dealt with in these conveyances. The 235 acre lease executed by Buckley in 1972 is as effective and valid at this date on the 155 acres owned by Rogers as it is on the 80 acres owned by Wilburn, notwithstanding that the producing well “holding” the lease is on the 80 acres conveyed to Wilburn. Calcasieu Real Estate, supra. See LRS 31:123, 124.
Wilburn argues that “the only fair and equitable way to decide this case is to let B.E. Wilburn receive the full royalty for his minerals. If a well is drilled on J.D. Rogers’ land and produces J.D. Rogers’ minerals, then let J.D. Rogers have the royalty.” We do not find merit in this argument because it ignores the practical result that under the status of this record, the 155 acres owned by Rogers is subject to the lease executed by Buckley which is being “held” by production. The lessee is under no obligation to separately develop the Rogers tract. Under these circumstances, it is not inequitable to apportion the royalty among Buckley’s successors in title who own the minerals under the respective tract conveyed to each of them.
CONCLUSION
In summary, either or both Buckley and his son could have dealt with some or all of the royalty from time to time in a manner contrary to the entirety clause, but, of course, not to the detriment of the lessee. They did not, however, expressly deal with the royalty before or after Buckley’s death, in any conveyance or in the will.
Wilburn acquired 80 acres with the minerals subject to the Buckley lease. Rogers acquired 155 acres with the minerals subject to the Buckley lease. Royalty accruing under that lease is owed to the transferees of the leased property in the proportion that each transferee’s property bears to the leased property. Calcasieu Real Estate, supra; Forrestier, supra; Williams and Meyers, supra.
Wilburn also complains that he should not have been assessed with all costs. He suggests that costs should be apportioned equally. CCP Art. 4659 provides that costs in a concursus proceeding may be awarded to the successful claimant or assessed in any manner which the trial court considers equitable. We find no abuse of discretion in the assessment of costs to the unsuccessful contestant in a concursus proceeding.
At appellant’s cost, judgment is AFFIRMED.

. “It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivisión by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to *589 offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all rentals or other sums accruing hereunder to the joint credit of Lessor.”